COLORADO COURT OF APPEALS                                    2016COA99

_____

Court of Appeals No. 15CA0124
Mesa County District Court No. 11CR1108
Honorable Richard T. Gurley, Judge

_____

The People of the State of Colorado,

Plaintiff-Appellee,

v.

David A. Relaford,

Defendant-Appellant.

_____

JUDGMENT AND SENTENCE AFFIRMED

Division V
Opinion by JUDGE BERGER
Román and Plank*, JJ., concur

Announced June 30, 2016

_____

Cynthia H. Coffman, Attorney General, Ellen M. Neel, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Joseph Paul Hough,
Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2015.

¶ 1 A jury convicted defendant, David A. Relaford, of twenty-seven offenses related to sexual assaults against two child victims, and the trial court sentenced him to an aggregate indeterminate term of 204 years to life under the Colorado Sex Offender Lifetime Supervision Act of 1998 (SOLSA), §§ 18-1.3-1001 to -1012, C.R.S. 2015. Relaford appeals the judgment of conviction and the sentence imposed.

¶ 2 Relaford argues that the trial court reversibly erred in admitting (1) expert testimony about the credibility of child victims of sexual assault and (2) numerous sex toys and pornography found at his home. He also argues that SOLSA is unconstitutional. We address and reject these contentions and affirm.

I. Facts and Procedural History

¶ 3 In the summer of 2011, seven-year-old O.S. and his adoptive mother lived with Relaford at his house. Several weeks after O.S. and his mother moved out, O.S. told his mother that Relaford had sexually assaulted him. His mother called the police, and a police detective conducted a forensic interview with O.S.

¶ 4 During the interview, O.S. described multiple incidents in which Relaford sexually assaulted him. O.S. said that Relaford

1

sometimes used sex toys during the assaults and they had watched a pornographic movie and looked at pornographic magazines together. O.S. also told the detective that he had witnessed Relaford sexually assault another child, M.D., an eight-year-old girl who lived nearby and was friends with O.S.

¶ 5 The detective conducted a forensic interview with M.D. M.D. initially denied that anything had happened with Relaford. About twenty-five minutes into the interview, the detective began to ask more focused questions about M.D.'s relationship and experiences with O.S. and Relaford. The detective told M.D. that O.S. said that he had seen something happen to M.D. when M.D. was at his house. About fifteen minutes later, the detective told M.D. that she (the detective) knew what had happened but that "it need[ed] to come from M.D." M.D. responded, "Dave [Relaford] has actually done it to me."

¶ 6 Like O.S., M.D. detailed several instances of sexual assault by Relaford, including at least one instance in which he used a sex toy. M.D. also described watching pornographic movies with Relaford and looking at pornographic magazines at his house.

¶ 7    The People charged Relaford with five incidents of sexual assault against O.S. and six incidents against M.D., differentiated by the location where each incident occurred.  For each incident, Relaford was charged with one count of sexual assault on a child and one count of sexual assault on a child by one in a position of trust.  He was also charged with four counts of committing sexual assault on a child as part of a pattern of abuse and one count of second degree kidnapping (based on M.D.'s statement that during one assault, Relaford took her from the living room of his home into his bedroom).

¶ 8    Both victims testified at trial, and video recordings of their forensic interviews were admitted and played for the jury.  The interviewing detective also testified regarding the interviews and the investigation of Relaford, including the search of his home (under a warrant) and his police interview.

¶ 9    The detective testified that the police had found numerous sex toys and pornographic videos and magazines at Relaford's house and property.  Many of the places where the sex toys and pornography were found were consistent with the victims' descriptions of those locations.  Both victims also said that Relaford

used Vaseline during the assaults, and O.S. testified that Relaford got the Vaseline from the bathroom. Vaseline was found in Relaford's bathroom. Additionally, O.S.'s description of several of the sex toys Relaford used during the assaults matched the appearance of some of the toys found. A sex toy that M.D. gave to her mother after her forensic interview was also admitted into evidence. Her mother testified that M.D. had told her that Relaford had given M.D. the toy with instructions to use it on herself.

¶ 10 The sex toys were submitted for DNA testing. The prosecution's DNA expert testified that DNA samples from one of the sex toys O.S. had identified matched O.S.'s and Relaford's DNA. DNA samples from the sex toy M.D. said Relaford had given her matched M.D.'s DNA.

¶ 11 The prosecution also presented testimony from the nurses who had examined the victims. The nurse who examined O.S. testified that the findings she made during her examination of his anus were consistent with the disclosures he had made to her about the sexual assaults by Relaford. The nurse who examined M.D. testified that she did not observe any injuries attributable to the

4

disclosures M.D. had made to her about the sexual assaults, but that did not mean M.D. had not been sexually assaulted.

¶ 12     Another part of the prosecution's case-in-chief was evidence of statements Relaford made during the investigation. The detective testified that during her interview of Relaford, he had initially told her that he had been alone with both children, that the children had never been in his bedroom, and that his pornography was locked up where the children could not access it. However, after the detective told Relaford that items had been collected for DNA tests, he said the children could have gotten into his bedroom and "snooped," and that he had never been alone with the children.

¶ 13     The detective also testified about a letter Relaford had written to his girlfriend after his arrest, which she had given to the police. In the letter, Relaford said that he had once masturbated in their tent when he was alone, and then he had "cleaned up" with soap and water. He said that when he went camping with O.S., O.S. vomited in almost the same spot. The prosecution argued that these statements were significant because O.S. alleged that Relaford had sexually assaulted him when they were camping, and before Relaford wrote the letter, the detective had told him essentially that

if the police found his DNA and the kids' DNA mixed together, it would be very bad for him.

¶ 14　　Relaford's defense at trial was primarily that the victims' testimony was not believable.  Among other things, defense counsel emphasized that (1) O.S. and M.D. testified to certain details that they had omitted in their forensic interviews; (2) M.D. initially denied that Relaford had sexually assaulted her; and (3) O.S.'s description in his interview regarding some of Relaford's physical characteristics was inaccurate.

¶ 15　　The jury convicted Relaford on all charges.  The trial court sentenced Relaford to twenty-four years' imprisonment for kidnapping, to be served consecutively to fifteen consecutive sentences of twelve years to life that were concurrent to eleven sentences of six years to life for the sexual assault convictions.

## II.  Expert Testimony

### A.  Additional Facts

¶ 16　　During trial, the prosecution presented testimony from a marriage and family therapist who was qualified as an expert in "child sexual assault and abuse, specifically patterns of disclosure, outcry statements, Victim-Offender relationship dynamics, the

process of memory, and suggestibility and fabrications." Defense counsel did not object to the therapist's qualifications as an expert in these areas. The therapist testified that she did not review any of the police reports in the case or watch the forensic interviews, but the prosecutor had provided her with some basic information about the ages of the children, the relationships of the parties, and where the events occurred.

¶ 17 The therapist then described the process of memory in general and in children who have been sexually assaulted. She testified that with multiple incidents of sexual assault occurring in similar locations, children might mix up the details of each episode, and inconsistent statements about what happened when were not unusual. Additionally, she testified that younger children were much more likely to omit an accurate detail about an event in one interview that they included in a later interview than they were to agree with suggestive or coercive questioning about something that did not occur. Defense counsel did not object to any of this testimony, and Relaford does not challenge it on appeal.

¶ 18 The prosecutor next asked the therapist a series of questions about "fabrication." The therapist testified that children do lie. She

said that preschool-age children lie when they are playing games like hide-and-go-seek, and older children lie to avoid the consequences of their actions and the blame, disappointment, or disapproval of adults. However, she testified that research showed that it is "pretty unusual, even kind of rare" for children to lie about an adult. She testified that the few times they do so is because they have mental health issues and (or alternatively) they are telling lies in "the school environment" about teachers, family members, or daycare providers.

¶ 19    After this testimony, the prosecutor asked the therapist about her experiences with children fabricating allegations of sexual assault. She testified that there were two areas in which practitioners had encountered such fabrication. One was with "system-savvy adolescents" who have "been in lots of different sorts of institutional settings" and might fabricate an allegation against a caregiver to force a placement change or to "get even." The other was in "very, very disturbed, high-conflict custody cases" in which one parent convinced the child to say the other parent was sexually abusing him or her. The therapist added that she had also

encountered situations in which adults misunderstood an innocent statement by a preschooler as an allegation of sexual assault.

¶ 20 The prosecutor then asked the therapist, "Okay, what about, of course, in our situation we're talking about a seven- and eight-year-old, a little bit beyond preschool? So, I mean, have you ever experienced a situation where somebody in that age, seven or eight — ," at which point defense counsel objected. At the bench, defense counsel explained that the prosecutor was trying to impermissibly "get [the therapist] to say that these kids were not lying." The trial court sustained the objection but told the prosecutor he could ask another question. The following colloquy between the prosecutor and the therapist then occurred:

> Q. [Prosecutor:] Okay, in your personal experience and practice, have you ever come across a false allegation of sexual abuse for — in any other circumstance, other than what you've already mentioned: severe mental health, system-savvy adolescent regarding placement, or high-conflict custody?
>
> A. [Therapist:] The — those are the only ones that I can think of that I have professionally seen in 30 years, or in the people I've supervised.

Defense counsel did not object to this testimony.

¶ 21    The therapist proceeded to testify about other topics, such as the dynamics between sexual abuse victims and perpetrators, including why a child might deny that abuse occurred or delay in disclosing a sexual assault; the typical demeanor of children during forensic interviews and when a child might make a "fantastic statement" about something that cannot be true; and the "grooming" of children for sexual assault, including the use of pornography and sex toys.  No objections were lodged to this testimony, and none of it is challenged on appeal.

¶ 22    At the close of evidence, the trial court gave the jury a standard credibility of witnesses instruction and instructed the jury that it was not bound by the testimony of experts and expert testimony was to be weighed as that of any other witness.

¶ 23    During rebuttal closing argument, the prosecutor relied on the therapist's testimony on fabrication to argue that none of the circumstances in which the therapist testified children lie about sexual assault were present here, thus implying that the victims were telling the truth.

## B. Law and Application

¶ 24    Relaford argues that the therapist's testimony regarding the circumstances in which a child might fabricate claims of sexual assault and her statement that she had never encountered sexual assault fabrications in any other circumstances constituted impermissible opinion testimony that the victims in this case were not lying. We agree, but we conclude that the admission of this evidence did not constitute plain error.

### 1. Admissibility of the Testimony

¶ 25    We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003). A trial court abuses its discretion if its ruling was manifestly arbitrary, unreasonable, or unfair, *id.*, or if it misconstrued or misapplied the law, *People v. Glover*, 2015 COA 16, ¶ 10.

¶ 26    CRE 402 provides that relevant evidence is generally admissible. However, specific evidentiary rules limit the admissibility of certain types of evidence. CRE 404(a) prohibits "[e]vidence of a person's character or a trait of his character" if admitted "for the purpose of proving that he acted in conformity therewith on a particular occasion." CRE 608(a) provides a limited

11

exception to the general rule of CRE 404(a) and allows a party, under the prescribed conditions, to present opinion or reputation evidence of a witness's character for truthfulness. *People v. Serra*, 2015 COA 130, ¶ 62.

¶ 27     "CRE 608 evidence is not permitted to establish whether a witness testified truthfully on the witness stand or whether he or she was truthful on a particular occasion." *Liggett v. People*, 135 P.3d 725, 731 (Colo. 2006). "[E]xperts may not offer their direct opinion on a child victim's truthfulness or their opinion on whether children tend to fabricate sexual abuse allegations." *People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009). The supreme court has held that expert testimony that children tend not to fabricate stories of sexual abuse is "tantamount to [an expert] testifying that [a] child victim was telling the truth about her allegations." *Id.* at 1082 (citing *People v. Snook*, 745 P.2d 647, 648 (Colo. 1987)).[1]

---

[1] In *People v. Snook*, 745 P.2d 647, 648-49 (Colo. 1987), the supreme court concluded that the expert's testimony that children tend not to fabricate stories of sexual abuse was improper under CRE 608(a) also because the testimony "necessarily refer[red] to [the victim's] character for truthfulness," and the victim's character for truthfulness had not been attacked at the time the expert opinion was offered. Although the supreme court did not explicitly state

12

¶ 28    On the other hand, expert testimony is admissible under CRE 702 "if the expert's specialized knowledge will assist the jury in understanding the evidence or in determining a fact in issue." *People v. Mintz,* 165 P.3d 829, 831 (Colo. App. 2007). Along these lines, "[a]n expert may testify as to the typical demeanor and behavioral traits displayed by a sexually abused child." *Id.* This type of testimony is generally admissible because it assists the jury in understanding the victim's behavior after the incident — why the victim acted the way he or she did. *See, e.g., People v. Fasy*, 829 P.2d 1314, 1317-18 (Colo. 1992); *People v. Morrison,* 985 P.2d 1, 3-6 (Colo. App. 1999), *aff'd,* 19 P.3d 668 (Colo. 2000); *People v. Koon,* 724 P.2d 1367, 1369-70 (Colo. App. 1986). "Background data providing a relevant insight into the puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation . . . is helpful and appropriate in cases of sexual abuse of children . . . ." *People v. Whitman,* 205 P.3d 371, 383 (Colo. App. 2007) (citation omitted).

---

that the testimony was improper both for this reason and because the expert opinion referred to the victim's truthfulness on a specific occasion, a careful reading of the decision shows that this is the case.

13

¶ 29    For example, in *Koon*, 724 P.2d at 1369, a division of this court held admissible expert "testimony by [a] police psychologist about behavioral patterns of child incest victims, and the supporting testimony by [a] social worker that the [child victim] fit these patterns." The division explained that the testimony was admissible to show that the reaction of the victim was "uniquely similar to the reaction of most victims of familial child abuse." *Id.* at 1369-70.

¶ 30    While such "testimony may incidentally give rise to an inference that a victim is or is not telling the truth about the specific incident," "this fact alone is insufficient to deny admission of the evidence, because expert testimony generally tends to bolster or attack the credibility of another witness." *Id.* at 1370; *see also Morrison*, 985 P.2d at 5-6 (Although this type of testimony "necessarily carrie[s] with it the implication that the child's report of sexual abuse was true," it is proper expert testimony because it "aid[s] the jury in understanding the typicality of reactions by [children] who have been subjected to sexual abuse that might, under other circumstances, be considered bizarre."); *People v.*

14

*Aldrich,* 849 P.2d 821, 829 (Colo. App. 1992); *People v. Deninger,*
772 P.2d 674, 676 (Colo. App. 1989).

¶ 31     However, *Koon* and similar cases "do not stand for the
proposition that testimony of general characteristics of any type is
admissible to attack or support a witness's credibility." *People v.
Cernazanu,* 2015 COA 122, ¶ 20.  Rather, they "deal with the
admissibility of general characteristics evidence which (1) relates to
an issue apart from credibility and (2) only incidentally tends to
corroborate a witness's testimony." *Id.*

¶ 32     The therapist's testimony here, that she had not encountered
any circumstances in her thirty-year career in which children had
lied about sexual abuse other than those she had described, did not
relate to an issue apart from credibility.  The testimony was not an
explanation of the typical demeanor and behavioral traits displayed
by a sexually abused child for the purpose of allowing the jury to
compare the victims' behavior with the typical behavior of child
sexual abuse victims and aid it in understanding the victims'
actions.  *Cf. Morrison,* 985 P.2d at 6 ("[S]ubstantially all of th[e]
expert's testimony was properly received under CRE 702 to aid the

jury in understanding the typicality of reactions by young boys who have been subjected to sexual abuse.").

¶ 33    The other testimony by the therapist, describing in general terms the process of memory, common reactions of child victims of sexual abuse, and the typical relationship between victims and perpetrators, served this purpose. That testimony could have assisted the jury in understanding, for example, O.S.'s delay in disclosing the sexual assaults to his mother; the inconsistencies between each victim's statements, including why the victim mentioned certain details in one statement that he or she had omitted in a prior statement; M.D.'s initial denial that Relaford had sexually assaulted her; and O.S.'s inaccurate description of Relaford's physical appearance. Thus, the therapist's testimony regarding the general behavior of child sexual assault victims could have aided the jurors in deciding the case by providing them a context in which to understand specific evidence, but it did not tell them what result to reach.

¶ 34    In contrast, the therapist's testimony about children fabricating sexual assault allegations did not serve any purpose other than to attempt to influence the jurors' credibility

determinations.  *See id.*; *see also Snook*, 745 P.2d at 649 ("[T]he jury's only conceivable use of [the] testimony would be as support for the [victims'] truthful character[s].").  Because the therapist testified that she had not encountered any circumstances other than those she had described in which children lied about being sexually assaulted, and those circumstances were not present in this case, the testimony necessarily constituted an impermissible expert opinion that the victims were "almost certainly telling the truth."  *Snook*, 745 P.2d at 649.

¶ 35    Accordingly, this evidence should not have been presented to the jury.

## 2.  Plain Error

¶ 36    Although defense counsel objected to one question that the prosecutor asked the therapist and the objection was sustained, defense counsel did not object to the testimony that we have concluded was inadmissible.  We thus review for plain error.  *See Wittrein*, 221 P.3d at 1082.

¶ 37    "To constitute plain error, the trial court's error must be obvious and substantial and so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability

of the judgment of conviction." *People v. Weinreich,* 119 P.3d 1073, 1078 (Colo. 2005).

¶ 38    An error may be obvious "if the issue has been decided by a division of this court or the Colorado Supreme Court." *People v. Ujaama,* 2012 COA 36, ¶ 42.

¶ 39    For two reasons, the admission of the therapist's testimony on fabrication was not plain error.

¶ 40    First, the error was not "obvious." *Miller,* 113 P.3d at 750. The therapist did not directly testify that the child victims were telling the truth, which would have been obviously impermissible. Conversely, under the existing case law, it is not always clear (or even consistent among cases) where to draw the line between expert testimony on the typical characteristics of sexual assault victims that is permissible and that which is impermissible because it is tantamount to an opinion that the victim was telling the truth.

¶ 41    *Cernazanu,* ¶ 20, explicitly states the rule that general characteristics evidence is permissible when the evidence "relates to an issue apart from credibility and . . . [it] only incidentally tends to corroborate a witness's testimony." But at issue in *Cernazanu,* ¶ 21, was testimony regarding "'characteristics' *peculiar* to [the

victim that] were directly indicative of [her] *credibility*," not the characteristics "of a class of victims." *Cernazanu*'s holding thus did not concern when expert testimony on the general characteristics of sexual assault victims is inadmissible because it constitutes an opinion that the victims in the case had been truthful.

¶ 42 Accordingly, the issue here "ha[d] not yet been decided by a division of this court or the Colorado Supreme Court," and so the error was not obvious. *People v. Sandoval-Candelaria*, 328 P.3d 193, 201 (Colo. App. 2011), *rev'd on other grounds*, 2014 CO 21; *see also People v. O'Connell*, 134 P.3d 460, 464 (Colo. App. 2005) ("[We] cannot correct an error pursuant to [plain error review] unless the error is clear under current law.") (citation omitted). However, the inadmissibility of expert testimony on the general characteristics of child sexual assault victims that does not relate to an issue other than credibility is an issue that has now been decided by a division of this court.

¶ 43 The second reason the admission of the expert's testimony in this case was not plain error is that the record does not "reveal[] a reasonable possibility that the error contributed to [Relaford's] conviction[s]." *Weinreich*, 119 P.3d at 1078. A reviewing court

19

"must evaluate [an error] in light of the entire record below" to determine its effect on the verdict and the trial. *People v. Eppens*, 979 P.2d 14, 18 (Colo. 1999). Whether the erroneous admission of testimony that a child victim was credible is plain error "turns to a considerable extent on both the strength and breadth of the properly admitted evidence, the extent and significance of the improper evidence or testimony, and the reliance, if any, of the prosecution in closing arguments on the improper evidence." *People v. Cook*, 197 P.3d 269, 276 (Colo. App. 2008).

¶ 44    Cases in which this type of error was held reversible include those in which "there was no physical evidence of, or third-party eyewitness testimony to, the alleged sexual assaults." *Koon*, 724 P.2d at 1370-71; *see also Snook*, 745 P.2d at 649; *Cernazanu*, ¶ 27; *Cook*, 197 P.3d at 276.

¶ 45    Conversely, an important factor that "mitigate[s] the potential power" of an expert's improper opinion of a child victim's veracity is that other evidence corroborates the child victim's allegations. *Eppens*, 979 P.2d at 18-19. Indeed, "the major factor [in determining whether an error was substantial] is the quantum and

quality of other and independent corroborating evidence of guilt."
*Cook*, 197 P.3d at 277.

¶ 46    For instance, in *People v. Gaffney*, 769 P.2d 1081, 1087-89 (Colo. 1989), the supreme court held harmless the admission of testimony by a doctor that the child victim's "history," which included his statement that the defendant sexually assaulted him, was "very believable." The supreme court explained that "of significance is the fact that [the victim's] statement to [the doctor] about the sexual assault was not without corroboration," which included the victim's testimony, the doctor's testimony that the results of the physical examination of the victim were consistent with the victim's description of the sexual assault, and the victim's mother's and the investigating police officer's testimony about the victim's statements to them. *Id.* at 1089.

¶ 47    Similarly, in *People v. Gillispie*, 767 P.2d 778, 780 (Colo. App. 1988), the admission of testimony by an expert that she believed the child victim's statement that she had been sexually abused was held harmless by a division of this court in part because "[t]he child victim described the assaults to four different people, each

description was consistent with the others, and medical evidence corroborated her detailed explanations."

¶ 48 Here, although the prosecutor relied on the therapist's improper fabrication testimony during rebuttal closing, most of the prosecutor's initial and rebuttal closing arguments focused on other evidence and the other parts of the therapist's testimony that were "properly received under CRE 702 to aid the jury in understanding the typicality of reactions by [children] who have been subjected to sexual abuse." *Morrison*, 985 P.2d at 4-6. The victims also both provided detailed testimony about the assaults and were cross-examined by defense counsel, thus "providing the jury with a full opportunity to judge [their] credibility in light of [their] demeanor." *Eppens*, 979 P.2d at 18-19. And the "jury was properly instructed as to how to evaluate expert testimony and . . . the general credibility . . . of witnesses." *Tevlin v. People*, 715 P.2d 338, 339-40, 342 (Colo. 1986).

¶ 49 While the credibility of O.S. and M.D. was undeniably a central focus at trial, there was substantial evidence, perhaps even overwhelming evidence, corroborating the victims' statements, such as the nurse's testimony that her physical examination of O.S.

showed injury consistent with sexual assault, the DNA evidence from the sex toys, and the details of the assaults that the victims provided that matched the evidence and the location of the evidence found in Relaford's home.

¶ 50     Moreover, the victims had very similar accounts of how and where Relaford sexually assaulted them, and O.S. testified that he had seen Relaford sexually assault M.D.  The victims' testimony, their forensic interview statements, and the testimony of other people to whom they had described the assaults — the detective, their mothers, and the nurses — showed that each victim's account was mostly the same in each statement.  And the statements of Relaford that were admitted tended to indicate consciousness of guilt.

¶ 51     Under all of these circumstances, we conclude that the admission of the therapist's testimony on fabrication did not "so undermine[] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Wittrein*, 221 P.3d at 1082 (citation omitted).  Thus, there was no plain error, and reversal is not required.

## III. Sex Toys and Pornography

### A. Additional Facts

¶ 52     Over defense counsel's objection, the trial court granted the prosecution's pretrial motion to admit as res gestae all of the sex toys and pornographic videos and magazines found during the search of Relaford's home.

¶ 53     At trial, numerous sex toys and accessories, and pictures of the items, were admitted into evidence, as was the detective's testimony about finding each item during the search of Relaford's home. The items admitted included at least three (and maybe four, the record is unclear) sex toys that O.S. identified in his testimony as those that Relaford had used when he sexually assaulted him. The sex toy that M.D. said Relaford had used on her and given to her was also admitted. There were other sex toys and accessories admitted, however, that were not identified or discussed by either victim.

¶ 54     Also admitted were eight pornographic VHS videos, thirty-three pornographic DVD videos, twenty-four pornographic magazines, and photographs of the items. The detective's testimony about these items included that although M.D. and O.S. had told

24

her that the videos they saw with Relaford had adults, teens, and children in them, the police did not find any illegal child pornography. The detective testified, however, that many of the videos found included "school-age dressed younger small-framed individuals that looked younger" (and one video was entitled, "Barely Legal Boot Camp Teens in Training"). The detective further testified that one of the videos matched a description M.D. had provided about watching a pornographic video that looked "cartoonish."

¶ 55 During closing argument, the prosecutor discussed the sex toys that the victims had identified and the results of the DNA testing and argued that this evidence corroborated the victims' testimony. The prosecutor also emphasized that the sex toys and pornography were found in locations consistent with the victims' descriptions.

¶ 56 In his closing argument, defense counsel essentially argued that the prosecution had introduced all of the sex toys and pornography to try to convince the jury that Relaford was a bad person and a "sexual molester." In rebuttal closing argument, the prosecutor expressly disclaimed such a purpose. The prosecutor

stated that it would be inappropriate for the jury to find Relaford guilty of sexual assault just because he had sex toys and pornography; rather, the prosecution had introduced the evidence because it corroborated the victims' disclosures and to establish the thoroughness of the police investigation.

## B. Law and Application

¶ 57 Relaford concedes that the admission of evidence regarding the sex toys the children identified was proper, but he argues that the trial court erred in admitting evidence of the other sex toys and the pornography because it was irrelevant and constituted impermissible bad acts or character evidence. We agree that some of this evidence probably should not have been admitted, but we conclude that any error in this respect was harmless.

¶ 58 We review the trial court's decision to admit the evidence for an abuse of discretion. *See People v. Perry*, 68 P.3d 472, 475 (Colo. App. 2002). Because Relaford objected to the admission of the evidence, we review for harmless error. *See Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009).

¶ 59 "Relevancy is a threshold standard which all evidentiary offerings must meet." *Vialpando v. People*, 727 P.2d 1090, 1094

26

(Colo. 1986). Evidence that is irrelevant — evidence that does not have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence — is inadmissible at trial. CRE 401, 402. However, even relevant evidence may be excluded under CRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice."

¶ 60 Evidence may also be excluded under CRE 404(b), which prohibits the admission of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show that he acted in conformity therewith." If evidence of other acts is offered only to show a defendant's bad character and that he "acted in conformity therewith" (often described as propensity evidence), the evidence will always be inadmissible. *Masters v. People*, 58 P.3d 979, 995 (Colo. 2002).

¶ 61 CRE 404(b) generally governs evidence of a defendant's other acts that are extrinsic to the events charged. *People v. Gee*, 2015 COA 151, ¶ 27. Res gestae evidence, on the other hand, is "[e]vidence of other offenses or acts that is not extrinsic to the offense charged, but rather, is part of the criminal episode or

transaction with which the defendant is charged." *People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994). Thus, while "CRE 404(b) evidence is independent from the charged offense, *res gestae* evidence is linked to the offense." *Id.* at 1373 n.12. Res gestae evidence is admissible so long as it is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice. *People v. Czemerynski*, 786 P.2d 1100, 1109 (Colo. 1990).

¶ 62     The sex toys identified by the victims were plainly relevant and admissible as direct evidence that Relaford had committed the crimes charged. Similarly, because pornographic magazines and videos were described by the victims and were found where the victims said that they had seen them, at least some of the pornography was properly admitted to corroborate the victims' statements. *See Aldrich*, 849 P.2d at 829 (concluding that the trial court did not abuse its discretion in admitting pornographic magazines found in the defendant's home under very similar circumstances).

¶ 63     Because this evidence was directly relevant, we do not need to consider the trial court's conclusion that it was admissible as res

gestae. We may affirm a trial court's ruling on grounds different from those upon which it relied, as long as they are supported by the record. *People v. Chase*, 2013 COA 27, ¶ 17. "*Res gestae* is a theory of relevance which recognizes that certain evidence is relevant because of its unique relationship to the charged crime," and thus, "where . . . evidence is admissible under general rules of relevancy," there is "no need to consider an alternative theory of relevance, such as *res gestae*." *People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009); *see also Gee*, ¶ 34.

¶ 64  Similarly, evidence of the sex toys described in the victims' statements and at least some of the pornography was not prohibited by CRE 404(b) because it did not "involve[] a separate and distinct episode wholly independent from the offense charged," *Quintana*, 882 P.2d at 1372, and its relevance did "not depend on an impermissible inference about [Relaford's] character," *Greenlee*, 200 P.3d at 368; *see also People v. Munoz*, 240 P.3d 311, 320-21 (Colo. App. 2009).

¶ 65  Nevertheless, it is difficult for us to discern the relevance of the evidence of the sex toys and accessories not identified by the victims or not found in a location they described. Likewise,

although some of the pornography was admissible to corroborate the victims' statements, not every pornographic video and magazine found was necessarily relevant for this purpose. And even if all the pornography was somehow relevant, the "major function [of CRE 403] is . . . excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Masters*, 58 P.3d at 1001 (citation omitted).

¶ 66     However, even if we were to conclude that some of the sex toys and pornography were irrelevant or their admission was prohibited by CRE 403 or CRE 404(b), we would not reverse on this basis. "Even when a trial court may have abused its discretion in admitting certain evidence, reversal is not required if the error was harmless . . . ." *People v. Summitt*, 132 P.3d 320, 327 (Colo. 2006). "If a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error may properly be deemed harmless." *People v. Stewart*, 55 P.3d 107, 124 (Colo. 2002) (citation omitted). Thus, a defendant is only "entitled to reversal if there is 'a reasonable probability that the error

contributed to the defendant's conviction.'" *Yusem*, 210 P.3d at 469 (citation omitted).

¶ 67    There was no such reasonable probability here, especially considering that some of the sex toys and pornography were properly admitted, and the prosecutor did not argue — and in fact explicitly disclaimed — that the jury should use the sex toys and pornography as propensity evidence.  Moreoever, as discussed above in Part II of the opinion, the prosecution presented a substantial, and maybe overwhelming, amount of other evidence that showed Relaford's guilt.  *Cf. Summitt*, 132 P.3d at 327 (holding that if properly admitted evidence overwhelmingly shows guilt, there is no reasonable probability that an error contributed to the conviction).

¶ 68    Considering the entire record of the trial and that the jury properly heard and viewed evidence of some of the sex toys and pornography, we can say with fair assurance that evidence of the other sex toys and pornography did not substantially influence the verdict or affect the fairness of the trial.  *See Masters*, 58 P.3d at 1002-03.

¶ 69    Accordingly, even if the admission of evidence of certain sex

toys and some of the pornography found at Relaford's home was

error, reversal is not required.

## IV.  SOLSA

¶ 70    Relaford argues that SOLSA, § 18-1.3-1004, C.R.S. 2015, is

facially unconstitutional.[2]  He contends that SOLSA violates an

offender's procedural and substantive due process and equal

protection rights, the prohibition against cruel and unusual

punishment, and the separation of powers doctrine.

¶ 71    Relaford did not raise these constitutional challenges at trial,

and we thus could decline to review them.  *See People v. DeWitt*,

275 P.3d 728, 730 (Colo. App. 2011).  However, even if we were to

exercise our discretion to review Relaford's constitutional claims, we

would conclude that he is not entitled to relief.

¶ 72    As Relaford concedes, several divisions of this court have

previously considered challenges to the constitutionality of SOLSA,

---

[2] Relaford also asserts that SOLSA is unconstitutional as applied. However, this assertion is not supported by any analysis or supporting authority.  We do not consider bare or conclusory assertions presented without argument or development.  *See People v. Durapau*, 280 P.3d 42, 49 (Colo. App. 2011).

and all have concluded that it is constitutional. *See People v. Collins*, 250 P.3d 668, 679 (Colo. App. 2010) (listing cases). Relaford's arguments are identical to those considered and rejected in those cases. *See, e.g., People v. Dash*, 104 P.3d 286, 290-93 (Colo. App. 2004); *People v. Oglethorpe*, 87 P.3d 129, 133-36 (Colo. App. 2003); *People v. Strean*, 74 P.3d 387, 393-95 (Colo. App. 2002).

¶ 73     Relaford has not provided any compelling reason for us to reconsider or depart from those decisions, and we reject his contentions for the reasons stated in those cases. *See People v. Villa*, 240 P.3d 343, 359 (Colo. App. 2009).

## V.  Conclusion

¶ 74     The judgment and sentence are affirmed.

JUDGE ROMÁN and JUDGE PLANK concur.