24CA1144 Peo v Stock 03-26-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1144
Mesa County District Court No. 22CR695
Honorable Valerie J. Robinson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Matthew Stock,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE BROWN
Freyre and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Robert W. Kiesnowski, Jr., Alternate Defense Counsel, Commerce City, Colorado, for Defendant-Appellant

¶ 1    Defendant, Matthew Stock, appeals his judgment of conviction and sentence following a jury verdict finding him guilty of sexual assault on a child (SAOC).  We affirm.

## I.    Background

¶ 2    Based on allegations that Stock sexually assaulted two children, the prosecution charged Stock with one count of SAOC and a crime of violence sentence enhancer (related to alleged victim V.S.) and one count of SAOC — use of force (related to alleged victim D.M.).  The prosecution also alleged that Stock was a habitual sex offender against children.  After a six-day trial, a jury acquitted Stock of the charges related to V.S. but convicted him of SAOC without use of force for his conduct related to D.M.  At the sentencing hearing, the district court adjudicated Stock a habitual sex offender against children and sentenced him to eighteen years to life in the custody of the Department of Corrections (DOC).

## II.    Analysis

¶ 3    Stock contends that the district court erred by (1) admitting a recording of D.M.'s forensic interview under the child hearsay statute, section 13-25-129, C.R.S. 2025; (2) allowing the prosecution to present the forensic interview to the jury before D.M.

1

testified; (3) permitting an expert witness to bolster the credibility of other witnesses; and (4) imposing a sentence that was grossly disproportionate to the crime charged. We perceive no basis to reverse.

## A.    Child Hearsay Evidence

¶ 4    Stock's first two contentions are interrelated. He contends that the district court (1) erred by admitting D.M.'s recorded forensic interview under the child hearsay statute because it may have been admissible under another statute or rule of evidence; and (2) improperly permitted the prosecution to publish the forensic interview to the jury before D.M. testified, bolstering her credibility and giving the prosecution an unfair advantage. We discern no reversible error.

### 1.    Applicable Law and Standard of Review

¶ 5    Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Generally, hearsay statements are presumptively inadmissible, absent a relevant court rule or statute providing an exception. CRE 802.

¶ 6     The child hearsay statute provides one such exception for statements made by a child sexual assault victim.  As relevant, section 13-25-129(2), (5), provides that an out-of-court statement made by a child describing all or part of an offense of unlawful sexual behavior as defined by section 16-22-102(9), C.R.S. 2025, is admissible in a criminal proceeding if (1) the statement "is not otherwise admissible by statute or court rule that provides an exception to the hearsay objection"; (2) the court conducts a pretrial hearing and finds "that the time, content, and circumstances of the statement provide sufficient safeguards of reliability"; and (3) the child testifies, or the child is unavailable and there is corroborative evidence of the act that is the subject of the hearsay statement.  *See People v. Dist. Ct.*, 776 P.2d 1083, 1089 (Colo. 1989).

¶ 7     To determine the reliability of a child's out-of-court statement, the court should consider the following nonexhaustive factors:

(1)     whether the statement was made spontaneously;

(2)     whether the statement was made while the child was still upset or in pain from the alleged abuse;

(3)     whether the language of the statement was likely to have been used by a child the age of the declarant;

(4)    whether the allegation was made in response to a leading question;

(5)    whether either the child or the hearsay witness had any bias against the defendant or any motive for lying;

(6)    whether any other event occurred between the time of the abuse and the time of the statement which could account for the contents of the statement;

(7)    whether more than one person heard the statement; and

(8)    the general character of the child.

*Id.* at 1089-90.

¶ 8    No single factor is mandatory or dispositive. *See People v. Phillips*, 2012 COA 176, ¶ 88. On the contrary, the factors "provide assistance and guidance to the trial judge and provide a basis for analysis, but [they] should not be used to foreclose admissibility on the basis that one factor has not been satisfied." *People v. Dist. Ct.*, 773 P.2d at 1090; *see People v. Cernazanu*, 2015 COA 122, ¶ 30 (the district court's reliance on six out of eight factors was sufficient to support its conclusion that the child hearsay was reliable).

¶ 9    We review a trial court's decision to admit child hearsay under the child hearsay statute for an abuse of discretion. *People v.*

*Whitman*, 205 P.3d 371, 381 (Colo. App. 2007). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16, *aff'd*, 2023 CO 22. However, "[t]he court's findings regarding the reliability of a child witness's out-of-court statements will not be disturbed on appeal if supported by the record." *Whitman*, 205 P.3d at 381.

¶ 10    If the defendant objected to the admission of the evidence at trial, we review any error under the harmless error standard. *People v. Hard*, 2014 COA 132, ¶ 23. But if the defendant failed to object, we review for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. Plain error is error that is both obvious and substantial, such that it so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Id.* The defendant bears the burden of establishing that plain error occurred. *People v. Conyac*, 2014 COA 8M, ¶ 54.

### 2.    Additional Background

¶ 11    D.M. participated in a forensic interview conducted by Mesa County Investigator Jenna Reed. Before trial, the prosecution filed a motion and notice of intent to admit a recording of D.M.'s forensic

interview under the child hearsay statute. Stock requested an evidentiary hearing.

¶ 12    At the hearing, Investigator Reed testified to her training and qualifications, as well as the circumstances of D.M.'s forensic interview. The prosecution argued that the time, content, and circumstances of D.M.'s statements provided sufficient safeguards of reliability in light of the investigator's training, her lack of familiarity with D.M., and her use of open-ended questions during the interview. Defense counsel argued that the statements were not reliable given that D.M. made them in a forensic interview that took place more than a year after the alleged criminal conduct.

¶ 13    Following the hearing, the district court issued a detailed written order. It found that D.M. was thirteen years old at the time of the forensic interview and that she intended to testify at trial. The court also made findings as to each of the reliability factors and concluded that "the time, content, and circumstances of each of the statements made to Investigator Reed during the interview provide[d] sufficient safeguards of reliability to make them admissible."

¶ 14     At trial, Investigator Reed testified three separate times. During opening statement, the prosecutor explained to the jury that, because there were two alleged victims, the prosecution planned to present its evidence in "chapters" — the first chapter would relate to V.S., and the second chapter would relate to D.M. During a break, defense counsel noted her understanding from the prosecutor's opening statement that Investigator Reed would testify twice and asked the district court for permission to cross-examine her "all at once the second time." The court agreed.

¶ 15     The first time the prosecution called Investigator Reed, she testified about her experience and training, acknowledged that she investigated allegations relating to both V.S. and D.M., and explained the protocols for conducting forensic interviews. She then testified exclusively about her investigation of the allegations relating to V.S. and laid the foundation for admission of V.S.'s forensic interview.

¶ 16     The second time Investigator Reed took the stand, the prosecutor began by noting some scheduling issues that would require Investigator Reed to return to testify again later during the trial. The prosecutor had Investigator Reed lay the foundation for

admission of D.M.'s forensic interview. The prosecutor then moved to admit the forensic interview, and defense counsel reasserted "the same objection as previously raised" but did not "have anything additional." "[B]ased on the earlier ruling," the court admitted the forensic interview. The recording was then played for the jury.

¶ 17 After the jury watched the forensic interview, D.M. testified. Defense counsel did not object to the sequencing of the evidence. As Stock concedes, D.M.'s in-court testimony "mirrored what she recounted in her forensic interview."

¶ 18 On the final trial day, the prosecution recalled Investigator Reed. This time, Investigator Reed testified about the details of her investigation of the allegations related to D.M., including reiterating some of the statements D.M. made during the forensic interview. Defense counsel then cross-examined Investigator Reed regarding both alleged victims.

### 3. Stock's Contentions Are Unpreserved

¶ 19 Before we reach the merits of Stock's contentions, we must first consider whether they are preserved. *See Forgette v. People*, 2023 CO 4, ¶ 15 (appellate courts have an independent, affirmative duty to determine whether a claim is preserved). To preserve an

8

issue for appeal, the defendant must raise the issue and provide the trial court with "an adequate opportunity to make findings of fact and conclusions of law." *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004); *see* CRE 103(a)(1). A timely, specific objection "allows the trial court a meaningful chance to prevent or correct the error and creates a record for appellate review." *Martinez v. People*, 2015 CO 16, ¶ 14.

¶ 20     Stock concedes he did not preserve his contention that the district court erred by admitting D.M.'s forensic interview under the child hearsay statute based on his argument that it was admissible under other hearsay exceptions. But with respect to his contention that the court erred by allowing the prosecution to present the forensic interview to the jury before D.M. testified, Stock argues that the claim is preserved because defense counsel objected to admission of the forensic interview. We conclude that neither contention is preserved.

¶ 21     The prosecution moved pretrial to admit D.M.'s forensic interview into evidence under the child hearsay statute. Defense counsel did not argue that the forensic interview was inadmissible under the child hearsay statute because it may have been

admissible under other exceptions to the hearsay rule. *See People v. Ujaama*, 2012 COA 36, ¶ 37 (an issue is unpreserved for review when an objection or request was made in the trial court, but on grounds different from those raised on appeal).

¶ 22  When the prosecution moved to admit the forensic interview before D.M. testified at trial, the district court asked whether defense counsel had any objection. Defense counsel stated that she "[did not] have anything additional" beyond the objection she had previously raised. Critically, defense counsel's prior objection did not alert the court to either the admissibility or sequencing issues Stock argues on appeal. Because Stock's contentions were not raised in or decided by the district court, they are unpreserved, and we will reverse only for plain error. *See Hagos*, ¶ 14; *Melendez*, 102 P.3d at 322.

4.  The District Court Did Not Plainly Err by Admitting D.M.'s Forensic Interview Under the Child Hearsay Statute or by Allowing the Prosecution to Present It Before D.M. Testified

¶ 23  Because Stock's contentions related to the district court's admission of D.M.'s forensic interview are interrelated, we address them together. Stock contends that the court erred by admitting D.M.'s forensic interview under the child hearsay statute because

10

her statements may have been admissible under other exceptions to the general hearsay rule. *See* § 13-25-129(2) (authorizing admission of a statement satisfying the statutory criteria "that is not otherwise admissible by a statute or court rule that provides an exception to the hearsay objection").[1] He contends that applying another hearsay exception would have required the prosecution to wait until *after* D.M. was impeached to admit the forensic interview. Thus, as best we understand, Stock contends that the prejudice resulting from the court's alleged error in admitting the forensic interview under the child hearsay statute was that the court allowed the prosecution to publish the forensic interview to the jury *before* D.M. testified. He also argues that allowing the prosecution to present the evidence in this way constituted a separate error.

¶ 24    Even assuming the court erred by admitting D.M.'s forensic interview under the child hearsay statute before D.M. testified and without first considering its admission under other hearsay exceptions, we nonetheless conclude that Stock has failed to establish that these alleged errors were substantially prejudicial

---

[1] Stock does not otherwise contend that D.M.'s forensic interview was not admissible under section 13-25-129(2), C.R.S. 2025.

under the plain error standard. *See Hagos,* ¶ 14; *see also Conyac,* ¶ 54 ("The defendant must . . . establish that the error was so grave that it undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the conviction.").

¶ 25    Stock argues that by allowing the prosecution to publish the forensic interview to the jury before D.M. testified, the court "erringly sanctioned a procedure that impermissibly bolstered [D.M.'s] trial testimony" and "fundamentally and unfairly tilted the playing field in the prosecution's favor." He argues that the allegedly erroneous procedure was "compounded when Investigator Reed testified for a third time and was permitted to reiterate to the jury what [D.M.] had stated in her forensic interview." But aside from generally asserting that the alleged errors "more than likely substantially influenced the jury's verdict and . . . fundamentally affected the fairness of [his] trial proceedings," Stock has not explained *how* the errors resulted in substantial prejudice.

¶ 26    As Stock concedes, the statements D.M. made in her forensic interview mirrored the testimony she provided in court. Stock fails to explain how the bolstering effect of the forensic interview would have been different had it been admitted after, rather than before,

12

D.M. testified. For example, Stock has not identified an inconsistency between D.M.'s forensic interview and her in-court testimony that he would have been able to explore had she testified first and had the video been played second. Nor does he claim that D.M. was present in the courtroom when the forensic interview was played such that she could have tailored her testimony to track what she said in the interview.

¶ 27 Although Stock claims that the presentation order allowed Investigator Reed to testify three times and reiterate D.M.'s account, he does not argue that any part of Investigator Reed's testimony was inadmissible or explain why the prosecution could not have called Investigator Reed to the stand three separate times even if the forensic interview had been admitted after D.M. testified. As noted, Investigator Reed testified multiple times partly because the prosecution wanted to present the evidence relating to V.S. separately from the evidence relating to D.M. and partly because of scheduling issues. She testified substantively about the allegations related to D.M. only one time.

¶ 28 Stock has failed to meet his burden to demonstrate how the order in which the evidence was presented impacted the

13

fundamental fairness of his trial. *See Conyac*, ¶ 54. Consequently, we conclude that his contentions related to the admission and presentation of D.M.'s forensic interview do not require reversal under the plain error standard. *See Hagos,* ¶ 14.

## B.     Expert Testimony

¶ 29     Stock contends that the district court erred by permitting a prosecution expert witness, Cheryl Young, to (1) opine on D.M.'s credibility and (2) improperly bolster Investigator Reed's credibility. We disagree.

### 1.     Applicable Law and Standard of Review

¶ 30     CRE 702 allows for the admission of qualified expert opinion testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. To that end, "[a]n expert may testify as to the typical demeanor and behavioral traits displayed by a sexually abused child." *People v. Mintz*, 165 P.3d 829, 831 (Colo. App. 2007). Testimony that provides relevant insights into the "puzzling aspects of the child's conduct and demeanor . . . is helpful and appropriate in cases of sexual abuse of children." *Whitman,* 205 P.3d at 383 (citation omitted). But "[a]n expert may not opine on a witness's credibility or that a witness was telling the truth on a

specific occasion." *People v. Collins*, 2021 COA 18, ¶ 58; *see People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009) ("[E]xperts may not offer their direct opinion on a child victim's truthfulness or their opinion on whether children tend to fabricate sexual abuse allegations.").

¶ 31    We review a trial court's admission of expert testimony for an abuse of discretion. *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011). A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *Id.*; *People v. Gee*, 2015 COA 151, ¶ 23.

¶ 32    Stock concedes, and we agree, that defense counsel "neither objected to the prosecution's expert witness's qualifications nor objected to the expert's trial testimony." Thus, we review Stock's expert-related contentions for plain error. *See Ujaama*, ¶¶ 37-38 (an issue is unpreserved if the objection is made on different or unspecified grounds that would not have alerted the trial court to the issue on review).

### 2.    Additional Background

¶ 33    At trial, the prosecution offered, and the district court qualified, Young — a licensed therapist — as an expert in "all

aspects of child sexual assault and abuse," "the patterns of disclosure and outcry statements of child sexual assault and abuse victims," "forensic protocol of child sexual abuse interviews," "the process of memory," and "research and experience in the area of suggestibility." As a generalized expert, Young explained that she "underst[ood] her role to be jury education." She clarified that she "[did not] really know anything at all about this case" and that she did not "intend[] to influence the jury or make any opinions about anybody being credible." She said, "That's not my role."

¶ 34    On direct examination, the prosecutor asked Young whether there had been any research done on "fabrication" or "children lying." Defense counsel objected to "bolstering," and the court sustained the objection. In response, the prosecutor said she thought "it actually help[ed] the [d]efense," but her comment was cut off by Young's answer to the question:

> So fabricating in children, there are reasons
> that kids fabricate. The most common reason
> that kids fabricate to us as parents and
> [caregivers] is to avoid our disappointment and
> disapproval. They also will lie to avoid
> consequences. They'll lie to continue a game,
> because there's plenty of games out there
> where you have to sort of lie in order to
> continue the game.

16

> When we look at kids lying maliciously or intentionally to get another person into trouble, less common. Certainly can be siblings fabricating that they didn't do something, the brother did it. Not uncommon. In a calculated, intentional way, lying to get an adult into trouble, the least common of all.

Defense counsel did not object again or move to strike Young's response.

¶ 35    The prosecutor also asked Young questions concerning the protocols for conducting a forensic examination of a child. Young explained "some key things that are foundational to a forensic interview," including that interviews should happen in a neutral environment, be video-recorded, include a cognitive assessment of the child, and assess whether the child understands what telling the truth means. According to Stock, Young's answers "overlapped" with Investigator Reed's testimony concerning the procedures for forensic interviews. For example, Investigator Reed explained that forensic interviews should be conducted in a neutral, comfortable, and safe environment; strive to obtain information using nonleading questions; be video- and audio-recorded; and assess whether the child understands the importance of telling the truth.

17

### 3. The District Court Did Not Plainly Err by Permitting Young's Testimony Regarding Fabrication

¶ 36    Stock contends that the district court plainly erred by permitting Young to opine on D.M.'s credibility.  In support of his argument, Stock cites *People v. Relaford*, 2016 COA 99, ¶¶ 16-35, a case in which a division of this court considered whether expert testimony offered by a licensed therapist improperly opined on the child victim's credibility.

¶ 37    There, the expert identified specific circumstances in which a child victim might fabricate allegations of sexual assault, including circumstances that involve "system-savvy adolescents" or "high-conflict custody cases."  *Id.* at ¶ 19.  The prosecutor asked the expert if they had "ever come across a false allegation of sexual abuse . . . in any other circumstance, other than what you've already mentioned," and the expert responded, "[T]hose are the only ones that I can think of that I have professionally seen in [thirty] years, or in the people I've supervised."  *Id.* at ¶ 20.

¶ 38    The division concluded that the expert's testimony "was not an explanation of the typical demeanor and behavioral traits displayed by a sexually abused child" and "did not serve any purpose other

18

than to attempt to influence the jurors' credibility determinations." *Id.* at ¶¶ 32, 34. Specifically, the division determined that because the expert testified "that she had not encountered any circumstances other than those she had described in which children lied about being sexually assaulted, and those circumstances were not present in this case, the testimony necessarily constituted an impermissible expert opinion that the victims were 'almost certainly telling the truth.'" *Id.* at ¶ 34 (quoting *People v. Snook*, 745 P.2d 647, 649 (Colo. 1987)).

¶ 39    Stock argues that "Young's testimony here was strikingly similar to the testimony that [the *Relaford*] division . . . concluded should not have been presented to the jury." We agree that Young's testimony that "the least common" lies told by children are those done "[i]n a calculated, intentional way . . . to get an adult into trouble" constituted improper bolstering — and it appears that the district court thought so too, given that it sustained defense counsel's objection on that basis. But we are not persuaded that the error was obvious for three reasons.

¶ 40    First, the record demonstrates that defense counsel was aware of the potential that Young's testimony could be bolstering. She

objected to the prosecutor's question, and the court sustained the objection. Following the prosecutor's comment that the anticipated testimony "actually help[ed] the [d]efense," the witness immediately answered the question, and defense counsel remained silent. Given how the issue developed at trial, we cannot fault the court for not intervening on defense counsel's behalf. *See Ujaama*, ¶ 42 ("Plain error assumes that the [trial] court should have intervened sua sponte because the error was so obvious." (citation omitted)); *cf. Forgette*, ¶¶ 2, 34 (when counsel is aware of all the pertinent facts but does not object or ask the court to take any action, the objection is waived).

¶ 41    Second, Young's testimony was far more general than the testimony at issue in *Relaford*. Rather than identifying the "only" circumstances in which a child might fabricate sexual abuse allegations, *Relaford*, ¶ 20, Young testified generally about various reasons why children lie. Notably, she did not focus her testimony on false sexual abuse allegations. Nor did she speak in absolutes like the expert witness in *Relaford*. *See id.* Instead, she gave a comparative opinion — that intentionally trying to get an adult in

trouble was the "least common" motivation for a child to lie —
without even quantifying how frequently children lie overall.

¶ 42   Third, Young specifically said it was not her job to "influence
the jury or make any opinions about anybody being credible." *Cf.*
*id.* at ¶ 34 (the expert's testimony "did not serve any purpose other
than to attempt to influence the jurors' credibility determinations").
She explained that her role was limited to educating the jurors on
issues that may be outside their scope of knowledge. *See People v.*
*Morrison*, 985 P.2d 1, 6 (Colo. App. 1999) ("[S]ubstantially all of
th[e] expert's testimony was properly received under CRE 702 to aid
the jury in understanding the typicality of reactions by young boys
who have been subjected to sexual abuse."), *aff'd*, 19 P.3d 668
(Colo. 2000). And she clarified for the jury that she did not know
anything about the facts of the case.

¶ 43   Under the circumstances, we conclude that it is not obvious
the court should have intervened to strike Young's testimony in the
absence of an objection by defense counsel. *See Ujaama*, ¶ 42.
Accordingly, we discern no plain error.

## 4. The District Court Did Not Err by Permitting Young's Testimony About Forensic Interviewing Protocols

¶ 44    Stock contends that the district court plainly erred by permitting Young to provide testimony that "overlapped" with Investigator Reed's testimony about the protocols for conducting a forensic examination. Despite conceding that "this error in itself may not warrant reversal," Stock argues that Young's testimony improperly bolstered Investigator Reed's credibility even though her credibility had not been attacked. We discern no error.

¶ 45    To be sure, Young did not directly opine on Investigator Reed's credibility. She did not evaluate the procedures Investigator Reed utilized to conduct D.M.'s forensic interview or conclude that those procedures were appropriate. Even if Young's testimony incidentally bolstered Investigator Reed's, we would be hard pressed to conclude that it was improper. *See People v. Cooper*, 2021 CO 69, ¶ 97 (the incidental bolstering effect of an expert's testimony on the credibility of another witness is acceptable where the testimony educated the jurors regarding matters about which they likely lacked knowledge or insight); *Relaford*, ¶ 30 (the incidental bolstering effect "alone is insufficient to deny admission of the

evidence, because expert testimony generally tends to bolster or attack the credibility of another witness" (citation omitted)).

¶ 46    Moreover, the proper procedures for conducting a forensic interview were not a focus of the evidence at trial and were not in dispute. There would have been no reason for the jury to question Investigator Reed's credibility regarding those procedures and no reason for it to be unduly influenced to credit Investigator Reed based on Young's testimony. Against this backdrop, we conclude that the district court did not err by allowing Young to testify regarding the procedures for conducting a forensic interview.

## C.    Proportionality

¶ 47    Stock contends that the district court erred by rejecting his proportionality challenge and imposing a sentence that was grossly disproportionate to the severity of his crime in violation of the Eighth Amendment to the United States Constitution. We disagree.

### 1.    Applicable Law and Standard of Review

¶ 48    The Eighth Amendment to the United States Constitution and article II, section 20, of the Colorado Constitution prohibit cruel and unusual punishments. *Wells-Yates v. People*, 2019 CO 90M, ¶¶ 5, 10. Those provisions require a sentence to be proportionate to the

crime. *Solem v. Helm*, 463 U.S. 277, 290 (1983); *Alvarez v. People*, 797 P.2d 37, 38 (Colo. 1990), *abrogated on other grounds by*, *Melton v. People*, 2019 CO 89, ¶ 18. We review de novo whether a sentence is unconstitutional because it is grossly disproportionate. *Wells-Yates*, ¶ 35.

¶ 49 To ensure sentences are not grossly disproportionate, a defendant convicted of being a habitual criminal is "entitled, upon request, to a proportionality review of his sentence." *People v. Deroulet*, 48 P.3d 520, 522 (Colo. 2002), *abrogated on other grounds by*, *Wells-Yates*, ¶¶ 63-65; *see Wells-Yates*, ¶ 8. Even so, "in most instances the General Assembly's determinations regarding the sentencing of habitual criminals will result in constitutionally proportionate sentences." *Deroulet*, 49 P.3d at 526.

¶ 50 The initial proportionality review is a two-step abbreviated review. First, the court must consider the gravity or seriousness of the triggering offense (the felony conviction for which a defendant was sentenced) and the predicate offenses (the prior felony convictions on which a defendant's habitual criminal adjudication was based). *Wells-Yates*, ¶ 23. Second, the court must consider "the harshness of the sentence imposed on the triggering offense."

24

*Id.* The harshness of the penalty includes both the length of the sentence as well as parole eligibility. *Id.* at ¶ 14. "The court must scrutinize the triggering offense and the predicate offenses and determine whether in combination they are so lacking in gravity or seriousness so as to suggest that the sentence is unconstitutionally disproportionate to the crime, taking into account the defendant's eligibility for parole." *Id.* at ¶ 23.

¶ 51    If a crime is considered per se grave or serious, the court may skip the first part of the abbreviated review — considering the gravity or seriousness of the offenses — and proceed directly to considering the harshness of the penalty. *Id.* at ¶ 13 (citing *Close v. People*, 48 P.3d 528, 538 (Colo. 2002)). A crime is per se grave or serious if, "based on [its] statutory elements, [it] necessarily involve[s] grave or serious conduct" and "would be grave or serious in every potential factual scenario." *Id.* at ¶ 63. For crimes that are not per se grave or serious, the court should consider the facts and circumstances underlying the triggering and predicate offenses. *People v. Session*, 2020 COA 158, ¶ 36.

¶ 52    If the abbreviated proportionality analysis does not give rise to an inference of gross disproportionality, no further analysis is

25

required, and the proportionality challenge fails. *Wells-Yates*, ¶¶ 8, 18. If the analysis gives rise to an inference of gross disproportionality, then the court must conduct an extended proportionality review, involving intrajurisdictional and interjurisdictional comparisons. *Id.*

### 2. Additional Background

¶ 53 Before sentencing, defense counsel filed a motion seeking a proportionality review of Stock's anticipated sentence. Stock conceded that, in 2010, he pleaded guilty to class 4 felony SAOC under section 18-3-405(1), C.R.S. 2006. He explained that, if he were to be adjudicated a habitual sex offender against children, his mandatory sentence would be eighteen years to life, which he argued was unconstitutionally disproportionate to his crime.

¶ 54 The district court conducted a combined proceeding to determine whether Stock was a habitual offender and to impose Stock's sentence. First, the court found that the prosecution had proved beyond a reasonable doubt that Stock was a habitual sex offender against children and adjudicated Stock accordingly. The court then heard sentencing arguments. The prosecution argued that, as a habitual sex offender against children, Stock's mandatory

minimum sentence was eighteen years to life in the custody of the DOC. In response, defense counsel argued that a sentence of eighteen years to life was "unconstitutionally disproportionate under the [Eighth] Amendment" but that, "[i]f the [c]ourt does not make that finding[,] we would join the [p]rosecution's request for a sentence of [eighteen] years to life."

¶ 55 The court explained that it was required to consider several factors when sentencing Stock, including "the nature of the offense, the character and rehabilitation potential of [Stock], development of respect for the law, the deterrence of crime, [and] the protection of the public." The court explained that it was "required to try to select a sentence, a sentence length, and a level of supervision that addresses [Stock's] individual characteristics and reduces the potential that [he will] engage in criminal conduct at the end of [his] sentence." In the end, the court sentenced Stock "under the habitual statute to [eighteen] years to life" in DOC custody.

¶ 56 As for Stock's argument that his sentence was grossly disproportionate under the Eighth Amendment, the court found that "sex assault on a child is a conviction that is per se grave and serious" and that "certainly . . . in this case . . . it is so." Finally,

after considering the harm caused by Stock's conduct, the court concluded that, "[b]ased on the factors set out in the [*Wells-Yates*] case, I do not find in this case that the sentence that was imposed [is] grossly disproportionate."

### 3. The District Court Did Not Err by Concluding that Stock's Sentence Was Constitutional

¶ 57    Stock contends that the district court erred by denying his Eighth Amendment claim because it (1) determined that SAOC was per se grave or serious without considering whether the crime would be grave or serious in every potential factual scenario; (2) failed to consider "the facts and circumstances underlying both his triggering offense and predicate offense"; and (3) failed to consider the harshness of the sentence imposed and Stock's eligibility for parole.  We are not persuaded.

¶ 58    We conclude that, based on its statutory elements, SAOC necessarily involves grave or serious conduct and is a per se grave or serious offense.  *See Wells-Yates*, ¶ 63.  At least one division of this court has already reached that conclusion in a published decision, albeit before *Wells-Yates* was announced.  *See People v. Strean*, 74 P.3d 387, 396 (Colo. App. 2002).  We see no reason to

28

depart from *Strean*, notwithstanding *Wells-Yates*' caution to use the per se grave or serious label "judiciously and deliberately" and only when a crime "would be grave or serious in every potential factual scenario." *Wells-Yates*, ¶¶ 61, 63.

¶ 59    For a defendant to be found guilty of SAOC, a jury must find beyond a reasonable doubt that (1) the defendant knowingly subjected another person who is not his spouse to any sexual contact; (2) the victim is less than fifteen years of age; and (3) the defendant is at least four years older than the victim. § 18-3-405(1), C.R.S. 2025.  As relevant here, sexual contact means "[t]he knowing touching of the victim's intimate parts by the actor . . . or the knowing touching of the clothing covering the immediate area of the victim's . . . intimate parts if that sexual contact is for the purposes of sexual arousal, gratification, or abuse." § 18-3-401(4)(a), C.R.S. 2025.

¶ 60    As divisions of this court have explained, "sex offenders have been convicted of crimes that society regards as particularly heinous," and the state has a great interest "in protecting the public from convicted sex offenders." *People v. Dash*, 104 P.3d 286, 291 (Colo. App. 2004); *see also Strean*, 74 P.3d at 396 (SAOC involves

"situations in which an adult treats a vulnerable child as a tool for sexual gratification, often causing a devastating and life-long effect"). Further, the General Assembly has declared that "sexual offenses are a matter of grave statewide concern" that involve "violations of the well-being, privacy, and security of the victims . . . and result in serious and long-lasting harm to individuals and society." § 16-10-301(1), C.R.S. 2025.

¶ 61    Given what a conviction for SAOC requires — particularly the perpetrator's sexual purpose and the age of the child victim — and the grave impact it has on both victims and society, we conclude that SAOC is "grave or serious in every potential factual scenario." *Wells-Yates*, ¶ 63. The district court did not err by so concluding. And because SAOC is a per se grave or serious offense, it follows that the court did not err by not separately considering the facts and circumstances underlying Stock's triggering and predicate offenses. *See id.* at ¶ 13.

¶ 62    Finally, we reject Stock's contention that the court erred by not adequately considering whether the harshness of his sentence was disproportionate to the charged conduct. Stock does not contest his adjudication as a habitual sex offender against children,

so the habitual sentencing requirements of section 18-3-412(2), C.R.S. 2025, apply. Under that statute, the court was required to "impose a sentence to the [DOC] of not less than three times the upper limit of the presumptive range for that class felony." § 18-3-412(2). Stock's SAOC conviction was a class 4 felony, *see* § 18-3-405(2), for which the presumptive sentencing range is two to six years to life in DOC custody, § 18-1.3-401(1)(a)(V.5)(A), C.R.S. 2025 (establishing the presumptive sentencing range for felony offenses); § 18-1.3-1004(1)(a), C.R.S. 2025 (requiring convicted sex offenders to be sentenced to "an indeterminate term of at least the minimum of the presumptive range specified in section 18-1.3-401 . . . and a maximum of the sex offender's natural life").

¶ 63    Combined, these statutes required the district court to impose a minimum sentence of eighteen years to life in DOC custody. When considering the harshness of a penalty, we afford legislative determinations regarding sentences great deference. *People v. Crawley*, 2024 COA 49, ¶ 12; *see Wells-Yates*, ¶ 21. And Stock is parole eligible, as the district court noted. *See* § 18-1.3-1006(1)(b), C.R.S. 2025 ("The period of parole for any sex offender convicted of

a class 4 felony shall be an indeterminate term of at least ten years and a maximum of the remainder of the sex offender's natural life.")

¶ 64 The court imposed the minimum sentence the legislature determined to be appropriate for a habitual sex offender against children convicted of class 4 felony SAOC, even though Stock was on parole for the prior SAOC when he engaged in the conduct for which he was convicted in this case. Considering Stock's predicate and triggering offenses in combination, we conclude that they are not "so lacking in gravity or seriousness" that a sentence of eighteen years to life for the triggering offense is grossly disproportionate. *Wells-Yates*, ¶ 23; *see id.* at ¶ 5 ("The Eighth Amendment does not require strict proportionality between crime and sentence . . . ." (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring))); *see also Strean*, 74 P.3d at 396 (minimum sentence of forty-eight years to life was not grossly disproportionate for class 3 felony SAOC). We conclude that Stock's sentence does not violate the Eighth Amendment.

### III. Disposition

¶ 65 We affirm Stock's judgment of conviction and sentence.

JUDGE FREYRE and JUDGE SCHUTZ concur.